STATE OF CONNECTICUT:
                : SS: HARTFORD                 MAY 9, 2023
COUNTY OF HARTFORD  :


Then and by virtue hereof, and by direction of the Plaintiff's Attorney, pursuant to C.G.S. 34-243r,
I left two (2) verified, true and attested copies of the within original FEDERAL SUMMONS IN A
CIVIL CASE, PROOF OF SERVICE, UNITED STATES DISTRICT COURT DISTRICT OF
CONNECTICUT COMPLAINT, PRAYER FOR RELIEF, DEMAND FOR JURY TRIAL, EXHIBIT A
and EXHIBIT B at the office of the Secretary of State, Registered Agent for Service and duly
authorized to accept service on behalf of the within named Defendant **ZAIGER LLC** and paid
statutory fees in the amount of $50.00, at 165 Capitol Avenue, in the City of Hartford, County of
Hartford.


The within are the original FEDERAL SUMMONS IN A CIVIL CASE, PROOF OF SERVICE,
UNITED STATES DISTRICT COURT DISTRICT OF CONNECTICUT COMPLAINT, PRAYER
FOR RELIEF, DEMAND FOR JURY TRIAL, EXHIBIT A and EXHIBIT B with my doings hereon
endorsed.


| SERVICE: | $ | 50.00 | ATTEST: |
| PD SEC OF STATE | | 50.00 | |
| PAGES | | 130.00 | |
| 6 MILES | | 3.93 | TIMOTHY J. BENNETT |
| ENDORSEMENTS | | 2.50 | CONNECTICUT STATE MARSHAL |
| TOTAL: | $ | 236.43 | HARTFORD COUNTY |

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WILLIAM W. BUCHER IV,

V.                                    **SUMMONS IN A CIVIL CASE**

ZAIGER LLC, ET AL.,

CASE NUMBER: **3:23−CV−00452−AWT**

TO: **Black Diamond Capital Management, LLC,
Stephen Deckoff, Jeffrey H. Zaiger, Zaiger LLC**
Defendant's Address:

Zaiger LLC
2187 Atlantic Street, 9th Floor
Stamford, CT 06902

A lawsuit has been filed against you.

Within **21** days after service of this summons on you (not counting the day you received it) − or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) − you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

**William J. O'Sullivan
O'Sullivan McCormack Jensen & Bliss PC
180 Glastonbury Blvd. Ste 210
Glastonbury, CT 06033**

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

/s/ − D Mendez
_____
*Signature of Clerk or Deputy Clerk*



**ISSUED ON** 2023−04−10 16:20:14, Clerk USDC CTD

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____
was received by me on *(date)* _____.

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*_____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____
_____ ; or

☐ Other *(specify)* _____
_____
_____

My fees are $_____ for travel and $ _____ for services, for a total of $_____0.00

I declare under penalty of perjury that this information is true.

Date: _____

*SEE*
*PLEASE MARSHAL'S Return*

_____
Servers signature

_____
Printed name and title

_____
Servers address

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM W. BUCHER IV, an individual, | : | |
| | : | CIVIL ACTION NO. |
| | : | |
| PLAINTIFF, | : | |
| v. | : | |
| | : | |
| ZAIGER LLC, a New York limited liability | : | |
| Company; JEFFREY H. ZAIGER, an individual; | : | |
| BLACK DIAMOND CAPITAL MANAGEMENT, | : | |
| LLC, a Delaware limited liability company; and | : | |
| STEPHEN DECKOFF, an individual, | : | |
| | : | |
| DEFENDANTS. | : | APRIL 10, 2023 |

## COMPLAINT

Plaintiff William W. Bucher IV ("Bucher") brings this action against defendants Jeffrey H. Zaiger ("Jeff Zaiger"); Zaiger LLC; Black Diamond Capital Management, LLC ("Black Diamond"); and Stephen Deckoff ("Deckoff"), and alleges as follows:

## INTRODUCTION

1.      Prior to August 15, 2022, Zaiger LLC had a single client, Black Diamond, representing only Black Diamond, its subsidiaries, its principals and employees, and their spouses.

2.      Bucher joined the law firm to lead Zaiger LLC's development and pursuit of mass arbitration strategies, bringing in new clients and a new revenue stream for the law firm. In return, Bucher would receive 50% of the profits the firm made from those cases.

3.      By February 28, 2023, Bucher had brought in over 48,000 new clients to the firm.

4.      Serving new clients meant legal and ethical duties to those clients, and Bucher zealously fought for those clients' interests, as he would for any client. Bucher insisted that the

1

interests of the new mass arbitration clients not be subordinated to Black Diamond's economic interests.

5.     Black Diamond sought to serve as a litigation financier for the mass arbitration cases, but then repeatedly refused to honor agreements it entered to do so. Black Diamond then proposed new terms that were unethical, not economically viable, and worse than the terms offered by other third-party funders. Bucher rejected the idea of subordinating the interests of the firm's 48,000 new clients to further the economic objectives of Black Diamond.

6.     Black Diamond, used to being Zaiger LLC's sole client and exercising complete control over the firm, grew frustrated with Bucher's zealous advocacy for the firm's new clients, which interfered with its desire to earn millions of dollars as litigation funders for the case. Black Diamond demanded Bucher be fired, threatening to pull all work from Zaiger LLC and to sue Jeff Zaiger, Bucher, and Zaiger LLC if Bucher was not fired.

7.     Zaiger LLC terminated Bucher on February 28, 2023, and is refusing to honor contractual agreements which entitle Bucher to 50% of the case profits even post-termination.

8.     Not merely content to deprive Bucher of his contractual interest in the cases, Jeff Zaiger has cast his ethical duties aside, refusing to inform clients that they have the choice to continue with Bucher as their counsel, refusing to provide Bucher with a complete list of clients so he can do so himself, and refusing to provide Bucher with a complete conflicts list that is necessary for him to continue to ethically engage in the practice of law.

9.     Bucher brings this action seeking preliminary relief in the form of a list of clients and their contact information so they can make an informed choice who their counsel will be going

forward and so that Bucher can fulfill his conflicts checking obligations at his new firm, and seeks a trial by jury to award monetary and other relief as alleged herein.

## PARTIES

10.     Bucher is an individual residing in the State of Connecticut.

11.     Jeff Zaiger is an individual residing in the State of New York.

12.     Zaiger LLC is a New York professional limited liability company with its principal place of business in the State of Connecticut.

13.     Black Diamond is a Delaware limited liability company with its principal place of business in the State of Connecticut.

14.     Deckoff is an individual residing, upon information and belief, in the State of New York.

## JURISDICTION

15.     This Court has original subject matter jurisdiction over the federal false advertising and unfair competition claims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

16.     This Court has supplemental jurisdiction over the state law claims asserted because they are part of the same case or controversy as the federal claim over which this Court has jurisdiction.  28 U.S.C. § 1367(a).

17.     All defendants are subject to personal jurisdiction because they established minimum jurisdictional contacts with the State of Connecticut in connection with plaintiff's claims.  Most of the relevant conduct occurred within Zaiger LLC's law offices and the Black Diamond headquarters building in the State of Connecticut.  Further, Zaiger LLC and Black

Diamond maintain a continuous and systematic presence in the State of Connecticut through their business operations in the state. Likewise, Jeff Zaiger is subject to general jurisdiction in the State of Connecticut because he operates a law firm in Connecticut and works most days from that law firm's office in Connecticut.

## VENUE

18.     Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1391(b) and (c) because defendants reside in or have their principal place of business in this district, a substantial part of the events and omissions giving rise to plaintiff's claims occurred in this district and a substantial part of the property that is the subject of plaintiff's claims is located in this district.

## BACKGROUND

**BUCHER PRESENTS ZAIGER LLC AND JEFF ZAIGER A PROPOSAL FOR MASS ARBITRATION STRATEGIES**

19.     Under U.S. law, consumers who enter into agreements with companies with arbitration provisions must bring their claims in arbitration, rather than as a class action.

20.     The precedent presents a logistical problem: when companies engage in unlawful conduct, there may be millions of consumers who each have to individually pursue their claims in arbitration, even when the legal issues may be similar or identical.

21.     At Bucher's prior law firm, he was exposed to the concept of mass arbitration: bringing thousands of identical claims in arbitration at once against a single defendant.

22.     At his prior law firm, Bucher was part of a team that defended over 70,000 mass arbitrations. Bucher won or settled them all.

23.     This included 160 cases that were won by a merits decision or withdrawal with prejudice by the opposing side immediately prior to a final merits decision.

4

24.     During his time litigating mass arbitrations at his prior firm, Bucher appeared before arbitrators more than fifty times, authored hundreds of documents including final merits briefs, and spent thousands of hours working on the cases.

25.     Bucher saw both the potential and pitfalls of a mass arbitration strategy. He believed that the strategy was a sensible way to vindicate the rights of consumers who had no alternative forum to do so, but also believed there were many improvements that could be made over the approach that had been taken by his opponents in the arbitrations he had won.

26.     By leveraging technology in new ways, Bucher believed that tens of thousands of claimants could be retained, kept up to date, and managed on separate arbitration cases with similar factual theories.

27.     On January 7, 2022, Jeff Zaiger and Bucher spoke on the phone.

28.     Prior to Bucher's employment, Jeff Zaiger's law firm, Zaiger LLC, worked exclusively for Black Diamond, its managed funds, portfolio companies, affiliates, investment partners, employees, and spouses of its founders.

29.     Further, Zaiger LLC and Black Diamond were (and are) intertwined in fundamental ways that are unheard of in the legal industry. Black Diamond essentially created Zaiger LLC as a captive law firm to perform legal work for Black Diamond and its affiliates. Zaiger LLC shares offices with Black Diamond in a building owned by Black Diamond.

30.     Unbeknownst to Bucher until the month of his termination, Zaiger LLC also lacks its own bookkeeper, accountant, payroll, human resources, or information technology staff, using Black Diamond's employees to serve all these functions. Black Diamond owns and controls Zaiger LLC's email servers through which it conducts client business and has the technical ability to

5

access or shut them off at any time. And prior to February 27, 2023, all of Zaiger LLC's bank accounts were structured in a manner that Black Diamond has the power to transfer money into and out of the accounts at its sole discretion.

31. Jeff Zaiger expressed interest in having Bucher build a mass arbitration practice at Zaiger LLC.

32. This represented a paradigm shift for Zaiger LLC. Zaiger LLC would go from serving the interests of only one client, Black Diamond, to taking on tens of thousands of additional consumer clients, to whom it would owe duties co-equal to those it owed Black Diamond.

33. Why Zaiger LLC and Jeff Zaiger would find this desirable is understandable. Upon information and belief, Zaiger LLC billed Black Diamond approximately $2.5 million a year for legal services. Bucher's mass arbitration practice represented an annualized increase of tens of millions of dollars of legal fee profits above any funding costs or overhead increases. Further, Bucher has mass arbitration expertise and consumer arbitration expertise, neither of which Zaiger LLC or Jeff Zaiger had any background or experience in.

34. Jeff Zaiger suggested that maybe Black Diamond could provide at least seed funding for the new mass arbitration practice and perhaps broader funding for specific mass arbitration strategies.

35. Bucher found the prospect of partnering with Zaiger LLC and Jeff Zaiger attractive because Zaiger LLC was an existing platform with infrastructure through which Bucher could launch his mass arbitration practice. Further, Zaiger LLC could potentially provide Bucher with a base salary to meet his personal expenses until revenues from the mass arbitration practice began to be realized. And either Zaiger LLC, or potentially Black Diamond as Jeff Zaiger had proposed,

could pay the seed costs of a mass arbitration practice, including hundreds of thousands of dollars of license fees for Client Resource Management ("CRM") software as well as online marketing costs.

36. On Jan 16, 2022, Bucher sent Jeff Zaiger a six-page proposal outlining the mass arbitration strategy he was proposing to start at Zaiger LLC.

37. On April 26, 2022, Jeff Zaiger, Ethan Auerbach ("Auerbach") of Black Diamond, and Bucher had a meeting to discuss the mass arbitration strategy and Bucher joining Zaiger LLC to lead it.

38. In June of 2022, Bucher and Jeff Zaiger prepared a slide deck outlining Bucher's mass arbitration proposal. A final version of that slide deck ("Mass Arbitration Slide Deck") was created on June 6, 2022.

39. That slide deck contemplated bringing a mass arbitration against Valve Corporation ("Valve") for their anti-competitive pricing restraints with respect to Valve's video game digital distribution service, called "Steam" (the "Steam Mass Arbitration"). The Steam Mass Arbitration was the first mass arbitration strategy that Bucher proposed to Jeff Zaiger that the new mass arbitration practice at Zaiger LLC could pursue.

40. On or around June 6, 2022, the Mass Arbitration Slide Deck was presented to Black Diamond for consideration.

41. On July 26, 2022, Jeff Zaiger sent Bucher an offer of employment (the "Original Employment Offer").

42.     Both the Original Employment Offer and the final drafted offer letter stated Bucher was being hired to "lead the Firm's development and pursuit of mass arbitration strategies (the 'Strategies')"

43.     The Original Employment Offer specified in Section 1(b) that Bucher would receive "a percentage of Z LLC's recovery from any cases brought pursuant to the Strategies commensurate with any percentage to be paid to Jeff Zaiger." The language was structured to give Jeff Zaiger and Bucher co-equal shares to account for the fact that Zaiger LLC received only 40% of any recovery in contingent fees and to allow for the possibility that Zaiger LLC might enter into funding arrangements or otherwise that would require it to share a percentage of its contingent fees with others. But given that Jeff Zaiger owned 100% of Zaiger LLC, both Bucher and Jeff Zaiger agreed that the contract was being worded in this manner to reflect that they would split any contingent fees realized by Zaiger LLC on a 50/50 basis.

44.     The Original Employment Offer specified that Bucher would be an "at will" employee and "the Firm may end your employment at any time for any or no reason."

45.     Bucher wanted insurance that Zaiger LLC would not act in bad faith by hiring him, having him build the needed systems to manage a large volume of clients, then fire him and not compensate for his work on the Mass Arbitration Strategies.

46.     Bucher and Jeff Zaiger therefore negotiated additional language to protect Bucher in the event the firm decided to terminate his employment after he had applied his skills and know-how to develop the systems needed for mass arbitration.

47.     That revised language included a provision that permitted Bucher the profits he was entitled to under Section 1(b) in the event of he was terminated without cause.

48.     The revised language stated "(i) if the Firm terminates your employment, without cause, you will be entitled to compensation outlined in Section 1(b) for services rendered and work performed on cases pursued pursuant to the Strategies while employed, on a *quantum meruit* basis, even if applicable revenue is received from such cases after termination."

49.     The revised language included a provision that required good faith negotiation over Bucher's compensation under Section 1(b) in the event of any termination.

50.     The revised language stated "that good faith discussions regarding resolution of any payment of compensation outlined in Compensation Section 1(b) shall occur in the event of either party terminating employment."

51.     An offer of employment with the revised language was executed on July 27, 2022.

**Bucher Achieves Rapid Success With Mass Arbitration Strategies**

52.     Bucher started employment at Zaiger LLC on August 15, 2022.

53.     That next day, Black Diamond entered into an agreement to provide seed funding for the mass arbitration strategies in the amount of $500,000 (the "Seed Funding Agreement").

54.     Within two weeks, Bucher launched a website that was dedicated to recruiting clients to participate in the Steam Mass Arbitration against Valve based on allegations that it acted as an illegal monopoly in the PC gaming market.

55.     Within a month of starting, Bucher created and ran the firm's first advertising campaign.

56.     Bucher identified needed software service providers to set up the system he envisioned.

9

57.     Bucher integrated these systems together to recruit clients, ultimately totaling in the tens of thousands.

58.     For example, Bucher set up an advertising campaign on Facebook, the comments for which were managed by Respondology, the traffic from which was directed to a website Bucher created.  This enabled users to submit an online survey Bucher created, which would trigger workflows Bucher coded to determine if the potential client was eligible to file a claim.  If they were eligible, clients would be sent an email from Bucher inviting them to sign to a retainer, which could be digitally e-signed by clicking a link within the email. If clients didn't sign within 20 minutes, they would receive a text message reminder from Bucher using a software platform called Twilio.

59.     While technically complex, the result was the creation of a simple system for potential claimants to determine if they were eligible to file a claim, to retain Bucher and Zaiger LLC as their lawyers, and for clients to communicate with Bucher and Zaiger LLC.

60.     Clients could respond to any email or text they received and receive an in-person answer from a Zaiger LLC employee, usually Bucher himself.

61.     Clients could also receive updates and view their documents through a web portal, enabling confidential communications to be delivered securely to the relevant claimants.

62.     The system Bucher set up was wildly successful.

63.     The Seed Funding Agreement and Mass Arbitration Slide Deck estimated that it would take approximately a year to get the software infrastructure set up to manage mass arbitration claims.

10

64. Within ten weeks of Bucher starting, Bucher had already set up the infrastructure to run mass arbitration campaigns, including advertising campaigns for potential clients, screening of clients for eligibility, sending them a custom retainer based on the preferences the client expressed at intake, digitally signing and filing the retainer, setting up a web portal that clients could ask questions and contact their attorneys through, and spent hundreds of hours communicating with clients.

65. By the end of November 2022, less than three months after Bucher began his employment, Bucher's advertising campaign had recruited over 20,000 Steam Mass Arbitration clients to bring arbitrations against Valve.

66. The Mass Arbitration Slide Deck had anticipated that it might cost up to $150 to recruit each client.

67. The advertising campaign that Bucher created recruited the initial 20,000 Steam Mass Arbitration clients for less than $7 each. By the time of Bucher's later departure from Zaiger LLC, approximately 48,000 clients had retained Bucher, Zaiger LLC and Jeff Zaiger.

68. Bucher spent more than 1300 hours on the mass arbitration strategy and the Steam Mass Arbitration specifically during his time at Zaiger LLC.

**BUCHER SERVES AS THE LEAD COUNSEL FOR THE MASS ARBITRATION CLIENTS**

69. As noted in his employment agreement, Bucher was hired to lead the development and pursuit of the firm's mass arbitration strategies, which he did.

70. Bucher, and no other attorney, appeared in the video advertisements that potential clients saw for the case.

11

71. After clicking on an advertisement, potential clients were taken to a website where they could complete a form to determine if they were eligible.

72. The website where clients completed claims forms included a photo of Bucher and Jeff Zaiger.

73. The website where clients completed claims forms stated "Jeffrey Zaiger, nine-time 'Super Lawyer' and 'New York Rising Star,' has teamed up with Will Bucher, chair of the American Bar Association's Digital Games and New Media Committee and Video Game Bar Association member to bring these antitrust claims against Valve. Together, we will negotiate, and if necessary litigate, your claim."

74. The website upon which clients completed claims forms contained a 90-second video, including only Bucher, and no other attorney, where Bucher explained the legal merits of the case against Valve.

75. Every single eligible client received an email from "William Ward Bucher IV" noting that he was "Admitted to Practice in New York" inviting them to "review and sign our retainer agreement" and noting "Once you sign the retainer agreement, we can get started on your claim and obtaining compensation for you." No other attorneys were mentioned in this email.

76. Bucher was specifically named in the retainer agreement that clients received.

77. When clients completed the claims form and were eligible, they received a text message from "Will," not Jeff Zaiger or any other attorney.

78. Tens of thousands of email communications were sent to clients bearing Bucher's name in the signature.

79.     When a case update was posted in January, it was a video in which Bucher explained the status of the case. No other attorney was featured.

80.     Press articles regarding the case mentioned Bucher and not any other lawyer.

81.     When clients or potential clients had concerns about the legitimacy of Zaiger LLC as a bona fide law firm that could take clients in the Steam Mass Arbitration, it was Zaiger LLC's policy to direct those clients to Bucher's LinkedIn page. Hundreds of clients were directed to do so.

82.     Every single one of the 48,000 clients retained prior to Bucher's departure received at least one communication from "Will," "Bucher," or "William Ward Bucher IV."

83.     For the vast majority of the 48,000 clients retained prior to Bucher's departure, the only attorney identified in any email or text they received from Zaiger LLC prior to February 28, 2023, was Bucher.

84.     Undoubtedly most, if not all, of these clients reasonably and correctly viewed Bucher as their attorney prior to his departure.

**BLACK DIAMOND AGREES TO FUND THE STEAM MASS ARBITRATION CASES.**

85.     By mid-October 2022, it became clear the mass arbitration strategy would be successful, and additional funding would be needed for the Steam Mass Arbitration cases.

86.     In mid-October 2022, Jeff Zaiger also revealed to Bucher that Black Diamond Capital had not been disbursing funds under the Seed Funding Agreement and that Jeff Zaiger has been paying costs from his own funds.

87.     Bucher; Jeff Zaiger; Black Diamond's portfolio manager, Ethan Auerbach ("Auerbach"); and one of Black Diamond's two General Counsels, Adam Tarken ("Tarken"),

13

began negotiating a larger deal for funding the Steam Mass Arbitration cases. Among other things, Black Diamond requested assurances that if it funded the Steam Mass Arbitration cases, Bucher would remain at Zaiger LLC to manage those cases. As an investor, Black Diamond's original requirement that it receive guarantees that Bucher would remain with Zaiger LLC to run these cases made sense, and was a requirement echoed by other litigation funders that Zaiger LLC approached later. Bucher was the only credible consumer arbitration or mass arbitration lawyer at Zaiger LLC and the architect of the Steam Mass Arbitration strategies.

88. On October 28, 2022, Bucher, Auerbach, Jeff Zaiger, and Tarken reached an agreement for funding.

89. In anticipation of Bucher remaining with Zaiger LLC for at least four years and becoming a partner, but lacking the time to complete a partnership agreement, Zaiger LLC and Bucher entered into a Partnership and Compensation Agreement.

90. The Partnership and Compensation Agreement stated "WHEREAS, Jeffrey Zaiger and Bucher intend to organize as a partnership between themselves and, at Judd Linden [another attorney at Zaiger LLC]'s option, Judd Linden, to ensure the continued commitment of themselves to the Strategies and ensure fair compensation for all involved."

91. The Partnership and Compensation Agreement further stated, "WHEREAS, Jeffrey Zaiger and Bucher intend compensation in the partnership to reflect that in Bucher's current employment agreement."

92. The Partnership and Compensation Agreement specified that "Jeffrey Zaiger and Z LLC commit to compensate Bucher, regardless of employment status, with a payout or percentage of any recovery from the Strategies equal to any percentage, payout, or allocation due to Jeffrey

14

Zaiger from the Strategies, or one-half the profit earned by Z LLC from the Strategies, whichever is greater."

93.     Also on October 28, 2022, Bucher, Auerbach, Jeff Zaiger, and Tarken had drafted a funding agreement ("October 28 Funding Agreement").

94.     The October 28 Funding Agreement contemplated the continued "employment of Bucher to lead the Firm's pursuit of the Strategies."

95.     To ensure that Bucher would continue to lead the mass arbitrations, the October 28 Funding Agreement made Bucher a party to the funding agreement.

96.     The October 28 Funding Agreement gave Black Diamond a four-year exclusivity period over the funding of similar mass arbitrations.

97.     On October 28, 2022, Bucher and Jeff Zaiger signed the October 28 Funding Agreement.

98.     On October 28, Deckoff, CEO of Black Diamond, asked Auerbach to wait to sign until he had reviewed.

99.     On or about October 31, Deckoff, on behalf of Black Diamond, entered into an oral agreement with Jeff Zaiger to fund the mass arbitrations on the same substantive terms as listed in the October 28 Funding Agreement, including that Bucher was a party to the agreement.

**BLACK DIAMOND RENEGES ON THE OCTOBER 28 AND 31 FUNDING AGREEMENTS, DEMANDS TO RE-NEGOTIATE FUNDING, AND BREACHES ITS SEED FUNDING AGREEMENT; ZAIGER LLC BEGINS TO SEEK ALTERNATIVE FUNDERS.**

100.     In November 2022, Deckoff began expressing to Jeff Zaiger that he wanted substantive changes to the terms of the October 28 Funding Agreement and that Black Diamond

would no longer honor the oral agreement.   He said that he wanted Black Diamond to receive a higher percentage return than was contemplated in the October 28 Funding Agreement.

101.    Throughout November 2022, Black Diamond continued to refuse to dispense amounts due under the $500,000 Seed Funding Agreement and demanded that a new funding agreement would be negotiated to replace the October 28 and October 30 agreements before Black Diamond would honor its commitments under the Seed Funding Agreement.  Upon information and belief, Black Diamond's motive for breaching the Seed Funding Agreement was to exert additional coercive economic pressure on Zaiger LLC, Jeff Zaiger and Bucher to agree to a new funding agreement on Black Diamond's terms.

102.    Bucher began to raise concerns with Jeff Zaiger that Black Diamond would never actually provide funding for these cases and suggested that, in order to fulfill its ethical duty towards its clients, Zaiger LLC needed to start securing other offers of funding to ensure the mass arbitration cases were financed.  Jeff Zaiger stated that he agreed.

103.    Accordingly, in November 2022, Jeff Zaiger reached out to some possible funders. And over the course of November, December and January, Bucher and Jeff Zaiger attended meetings with at least six possible litigation funders for the Steam Mass Arbitration.

**BLACK DIAMOND DEMANDS UNCONSCIONABLE AND UNETHICAL CONDITIONS ON FUNDING, AND DECKER BECOMES ANGRY WHEN BUCHER BALKS AT THESE DEMANDS**

104.    In the first week of January 2023, Bucher, Jeff Zaiger, Deckoff, and Black Diamond's other General Counsel, Sam Goldfarb ("Goldfarb") had a meeting concerning funding the cases.

105.    During that meeting, Deckoff demanded terms starkly different from those agreed to in October.

106.    Deckoff proposed taking an equity interest in the Steam Mass Arbitration cases of 60% of fees otherwise owed to Zaiger LLC in its fee agreements with its Steam Mass Arbitration clients as compensation for the investment in the cases, plus repayment of the amount spent by Black Diamond with interest.

107.    Deckoff said his funding was contingent on Zaiger LLC agreeing, in advance, to drop the mass arbitrations and abandon the Steam Mass Arbitration clients if Valve does not immediately settle the case upon notice that the Steam Mass Arbitration clients have paid their filing fees and if, instead, Valve pays its own filing fees in arbitration and prepares to defend the individual arbitrations on the merits.  He expressed his belief that any litigation of the cases after Valve had paid its arbitration fees would be fruitless and that he was uninterested in paying for it. He further stated that "once the filing fees are paid by Valve, the cow is out of the barn. Just not our barn."

108.    Bucher interjected that the provisions that Deckoff and Black Diamond were demanding posed serious ethical concerns.  Bucher stated that although given the economics of mass arbitrations Valve would have a strong economic incentive to settle the Steam Mass Arbitration claims before it had to incur potentially hundreds of millions of dollars of arbitration filing fees, there was no guarantee that Valve would do so and that Zaiger LLC needed to be prepared to litigate each of these individual consumer arbitrations that comprised the Steam Mass Arbitration claims if no early settlement was reached.  Bucher further stated that as lawyers, Bucher and Zaiger LLC couldn't take on cases they had no intention of pursuing and that a

17

premeditated intention to abandon the Steam Mass Arbitration clients unless there was a quick settlement would be improper.

109.    Jeff Zaiger agreed and stated that he was "a lawyer, not a snake oil salesman" and that he could not ethically take on cases he was unwilling to actually litigate.

110.    Deckoff responded: "Well whatever your ethical obligations, I'm sure there is some amount of money that would let you forget about them."  He further stated that he went into finance, not law, because he was unconcerned with ethics and that he wasn't going to invest the millions of dollars needed unless he controlled the venture.

111.    At this point, Bucher expressed concerns about the level of control Black Diamond was contemplating taking in the mass arbitration cases.

112.    Deckoff expressed that without Black Diamond's ability to control when the litigation ended, the litigation might go on for decades.

113.    Bucher responded that so long as Zaiger LLC is winning arbitrations, the cases are viable, and the clients want to proceed, he was absolutely prepared to litigate these cases for decades. Bucher pointed out that the Sherman Act had a mandatory award for attorneys' fees, so that if the cases were being successful, there would be additional revenue to hire more lawyers. Bucher expressed that if needed to pursue individual arbitrations, he would use the revenue from early arbitration wins to build a law firm devoted to litigating these cases.

114.    Deckoff replied that the idea was absurd.

115.    Bucher further expressed that under the ethics rules, a non-recourse, high interest loan was less concerning than the equity style investment Deckoff was proposing, and that the deal would be better structured that way.

18

116.    Deckoff responded that he was uninterested in a flat interest deal.  He further stated that his offer was take it or leave it.

117.    During the meeting, Deckoff at times seemed noticeably frustrated or angry at the statements Bucher was making about Black Diamond's demands to control the litigation, the ethical concerns associated with Black Diamond's demands, the lawyers' duties to their Steam Mass Arbitration clients, and the undesirable economics of Black Diamond's proposal.

118.    The week following the meeting, Jeff Zaiger expressed that Bucher should have "cowered more" when meeting with Deckoff because Deckoff was a billionaire accustomed to people doing what he says. Bucher was taken aback by this statement and said that neither he nor their 48,000 clients would be well served by "cowering" to anyone. Bucher noted "We're plaintiffs' lawyers now. We're in the business of suing billionaires. I'm not going to cower before Steve or Gabe [the CEO of Valve] if they don't offer our clients a fair deal."

119.    In the week following the meeting Jeff Zaiger asked if Bucher was really willing to litigate 160 individual arbitrations again if Valve contested the Steam Mass Arbitration cases. Bucher responded, "No, I'm prepared to litigate thousands."

## BUCHER, ZAIGER LLC AND JEFF ZAIGER RECEIVE A SUPERIOR ALTERNATIVE FUNDING OFFER

120.    In January 2023, Bucher and Jeff Zaiger obtained three terms sheets from potential funders other than Black Diamond offering to fund the Steam Mass Arbitration.

121.    The best offer Zaiger LLC received was an offer from an alternative funder (the "Alternative Funder") for eight-figures in funding as a non-recourse loan, repaid with interest depending on how long the case took to resolve and with no equity interest in the recovery.

122.    Jeff Zaiger shared the term sheet with Black Diamond, asking if they would be willing to match the terms.  Jeff Zaiger called and emailed Black Diamond many times over the five days following receipt of the offer from the Alternative Funder.  Black Diamond refused to respond or to otherwise engage with Jeff Zaiger regarding the offer.

123.    Zaiger LLC told Black Diamond that they needed an answer by Sunday, January 22, 2023.

124.    Upon hearing nothing from Black Diamond, Zaiger LLC executed the term sheet early in the morning on January 23 with the Alternative Funder, committing them to have the Alternative Funder provide funding for the Steam Mass Arbitrations.

## NAHAS LEARNS THAT ZAIGER LLC ENTERED INTO A FUNDING AGREEMENT WITH AN ALTERNATIVE FUNDER AND BECOMES ANGRY AT BUCHER

125.    Mounir Nahas ("Nahas") is Black Diamond's Chief Operating Officer.

126.    On or around February 7, 2023, Nahas learned that Zaiger LLC had signed the term sheet with the Alternative Funder.

127.    Nahas came into Jeff Zaiger's office soon thereafter and seemed enraged that Zaiger LLC had accepted funding from somewhere else.  He stated that the attorneys in Zaiger LLC were Black Diamond's lawyers and that accepting funding for the Steam Mass Arbitration claims from anyone else was a betrayal.  He said that discovering that Zaiger LLC and Jeff Zaiger had chosen another funder was worse than discovering marital infidelity.

128.    Nahas also expressed his belief that Bucher was similar to the character "Iago" and that without Bucher's influence, Jeff Zaiger would have never sought funding elsewhere.  Nahas said he was outraged that Bucher was coming into "my office" and "eating my food" and demanded that Jeff Zaiger stop allowing Bucher to come into "his" office for work.

129.     Nahas expressed anger that Jeff Zaiger would be doing any work that didn't directly profit Zaiger LLC and stated that there "would be consequences" for Zaiger LLC if Zaiger LLC proceeded to get funding from the Alternative Funder.

130.     Jeff Zaiger said, "let's not mince words, you mean you'll withdraw all Black Diamond's work from the firm." Nahas replied that was correct.

131.     Upon information and belief, from February 8, 2023, Nahas, Deckoff and other Black Diamond representatives repeatedly demanded that Zaiger LLC and Jeff Zaiger terminate Bucher, refuse to pay Bucher the contractual amounts owed to Bucher for the value he provided in the Steam Mass Arbitration matters, and sever all ties with Bucher.

## BLACK DIAMOND DEMANDS BUCHER'S OUSTER, AND ZAIGER LLC AND JEFF ZAIGER COMPLY

### a.   February 8, 2023, Telephone Call Between Jeff Zaiger and Bucher

132.     Jeff Zaiger called Bucher on February 8, 2023, to relay and discuss his conversation with Nahas. Jeff Zaiger expressed that he feared losing Black Diamond's business. Jeff Zaiger stated that because Black Diamond was responsible for all of his current income, he couldn't survive if he lost their business.

133.     Jeff Zaiger further stated that everything possible had to be done to salvage the relationship with Black Diamond and that Zaiger LLC had to take a funding deal with Black Diamond to save the business relationship.

134.     Jeff Zaiger expressed that Bucher was now prohibited from coming into the office during working hours because it would anger Deckoff and Nahas.

135. Bucher reminded Jeff Zaiger of his ethical duties and that it was impermissible to let one Zaiger LLC client, Black Diamond, who was not part of the Steam Mass Arbitration, dictate the cases of the tens of thousands of Steam Mass Arbitration clients.

136. Bucher also pointed out that any future deal with Black Diamond might not be honored because Black Diamond never paid the full amount due under the Seed Funding Agreement and Deckoff had disavowed the agreement he and Jeff Zaiger had orally made.

137. Bucher also expressed that given Black Diamond's repeated failure to disburse money under its current commitments, any deal with Black Diamond might not leave the Steam Mass Arbitration clients actually funded.

138. Bucher pointed out that it was likely that even if Black Diamond did pay the filing fees, Black Diamond would refuse to provide funding for litigation if that became necessary, given Deckoff's demand that, if Valve did not immediately settle upon Zaiger LLC paying the initial filing fees of the Steam Mass Arbitration clients, that Zaiger LLC should abandon those clients.

139. Jeff Zaiger responded that even if Zaiger LLC did want to act against Black Diamond's wishes, it would be very difficult to disentangle from Black Diamond because of Zaiger LLC's complete dependence on Black Diamond. Jeff Zaiger noted that Zaiger LLC shared a bookkeeper, accounting, and human resources staff with Black Diamond. Jeff Zaiger noted that Black Diamond owned the building in which Zaiger LLC's office was located and that Zaiger LLC shared an office with Black Diamond and would need to locate new office space.

140. Bucher expressed concerns that Black Diamond might ask Jeff Zaiger to terminate Bucher. Jeff Zaiger replied that he wouldn't fire Bucher. Jeff Zaiger also noted that even if Bucher were terminated for some reason, they had a contract that would protect Bucher.

22

141.   During the February 8 call, Jeff Zaiger also stated that aside from Zaiger LLC, he personally could not survive without the income from existing billable work for Black Diamond and that he had insufficient savings to weather any withdrawal of Black Diamond work.

**b.   February 13, 2023, Meeting At Bucher's Apartment**

142.   On Monday, February 13, 2023, Jeff Zaiger and Judd Linden ("Linden") held a meeting with Bucher at Bucher's apartment.  The meeting was held at Bucher's apartment because Black Diamond had insisted that Bucher no longer come into the office, a building owned by Black Diamond.

143.   The meeting was to discuss the pressure Black Diamond was exerting on Zaiger LLC and how to create a viable path forward.

144.   During that meeting, Jeff Zaiger stated that they must do everything possible to salvage the Black Diamond relationship.  He insisted that in order to do so, Bucher should not come into the office ever again during working hours.

145.   Bucher pointed out that if Zaiger LLC signed the deal with the Alternative Funder, they would have millions of dollars in funding, some of which they could use to make payroll for employees of the firm to the extent they were working on the Steam Mass Arbitration, and that therefore Zaiger LLC was not financially dependent on Black Diamond. Zaiger LLC could fully discharge its ethical duties to the Steam Mass Arbitration clients and have the financial resources to weather the period of time to resolve the Steam Mass Arbitration cases and obtain a recovery, even if Black Diamond withdrew all business out of anger that Zaiger LLC has chosen the Alternative Funder.

146.     Jeff Zaiger responded that he personally would not receive funds from any monies loaned by the Alternative Funder for his own personal expenses and had insufficient savings to wait until a recovery on the Steam Mass Arbitration cases.  Therefore, irrespective of whether there were funds available to meet payroll for others at Zaiger LLC, Jeff Zaiger could not personally afford to lose Black Diamond as a client.

### c.  February 26, 2023, Telephone Call With Deckoff

147.     On Feb. 24 or 25, 2023, Jeff Zaiger asked Bucher to come into the office on Sunday, Feb. 26, 2023.

148.     When Bucher arrived at the office in the morning, he walked into Jeff Zaiger's office, where Jeff Zaiger was having a speaker phone conversation with Deckoff.  Jeff Zaiger did not notify Deckoff that Bucher had entered the office or was listening to the conversation.

149.     Jeff Zaiger and Deckoff were discussing Deckoff's repeated demands that Jeff Zaiger terminate Bucher's employment.  Jeff asked: "Steve, what is wrong with Will?"  Deckoff replied: "He's a fucking a loser. I know you think this is your golden ticket, but trust me, you'll regret it if you keep working with Will."

150.     Jeff Zaiger stated:  "I need Will to run these cases."  Deckoff responded: "If you need Will to run these cases, you're a shit lawyer Jeff."

151.     During the call, Jeff Zaiger stated: "Steve, I have ethical obligations to my clients I can't just ignore."  Deckoff responded:  "Fire Will, and you, me, and an ethics lawyer will sit down to figure out the ethics issues."

152.     Jeff Zaiger also stated:  "I have a contract with Will. What am I supposed to do about that?"  Steve replied: "Contracts are meant to be broken, Jeff."

153.    During that call, Deckoff disparaged Zaiger LLC's Steam Mass Arbitration clients and referred to them as "AIDS-infested."

154.    After the call, Jeff Zaiger expressed that "he was glad he recorded the call." Bucher asked if he'd really recorded it. Jeff Zaiger nodded affirmatively in response to Bucher's question about whether he'd really recorded the call with Deckoff.

155.    Following the call, Jeff Zaiger and Bucher spoke. Jeff Zaiger said that he was very concerned that Black Diamond would terminate its business with Zaiger LLC.

156.    Jeff Zaiger stated he needed to go to the bank the next morning because the firm didn't have a bank account that wasn't controlled by Black Diamond. He explained that although Zaiger LLC's bank accounts were in the firm's name, Black Diamond staff had the ability to move money into and out of the account.

157.    Jeff Zaiger also stated: "I don't know that our keycards will work after tomorrow, so best to take anything you need from the office."

**d.  February 27, 2023, Meeting At Bucher's Apartment**

158.    The morning of Feb. 27, 2023, Jeff Zaiger and Linden, the only other attorney at Zaiger LLC, surprised Bucher at his apartment in the morning, around 9:30 AM, arriving unannounced.

159.    When they arrived, Jeff Zaiger explained that Black Diamond had renewed its threat to stop doing business with Zaiger LLC if Zaiger LLC accepted funding from another source. He also explained that Black Diamond had also threatened to sue Zaiger LLC if Zaiger LLC accepted funding from another source.

160.     Jeff Zaiger stated that he had talked with his wife about the situation the prior evening.  He said that he was fearful of what Black Diamond's threats would mean to him and his family.  He said that Black Diamond doesn't make threats idly, and Jeff Zaiger had to take the threat of the lawsuit seriously.  He further expressed that he simply couldn't be sued by Black Diamond under any circumstances.

161.     Jeff Zaiger also said that he was entirely dependent on the income from Black Diamond and that without the income from Black Diamond he couldn't support his family.  Jeff Zaiger stated that although he had $1.2 million in savings that he could have otherwise used to weather any loss of Black Diamond income and give himself financial independence, that entire amount was being managed by and under the custody of Black Diamond.  Jeff Zaiger further stated that Black Diamond was asserting they had the right to withhold that money if Jeff Zaiger stopped doing work for Black Diamond and that he was unwilling to risk losing the $1.2 million he had invested in Black Diamond under any circumstances.

162.     Jeff Zaiger expressed that given his current situation, given his complete financial dependence on Black Diamond, which controlled both his income and held his savings, he had to do whatever Deckoff wanted.

163.     Bucher responded that he was concerned that Jeff Zaiger was placing his personal interests above those of his Steam Mass Arbitration clients, a violation of his ethical duties.

164.     Bucher noted that the Alternative Funder was ready to sign the final eight-figure deal that day and asked how they should proceed.  Jeff Zaiger rejected the idea of moving forward with the Alternative Funder because it would risk the ire of Black Diamond.

26

165.    Bucher asked if Black Diamond had committed to fund on the same terms as proposed by the Alternative Funder, or whether Black Diamond had actually committed to fund the Steam Mass Arbitration cases at all given the critical need to have sufficient funds to pay initial filing fees on behalf of tens of thousands of consumers.  Jeff Zaiger replied they had not.

166.    Bucher expressed concern about how Zaiger LLC could ethically not accept the deal to fund their 48,000 clients without another viable offer on the table, since those clients expected to have their filing fees funded, which would total $3,600,000.

167.    Bucher asked what Jeff Zaiger would do if Black Diamond demanded that he terminate all the Steam Mass Arbitration clients and return to working for Black Diamond exclusively.  Jeff Zaiger said that he didn't know, but he didn't think it would come to that.

168.    Bucher also asked what Jeff Zaiger would do if Decker demanded, as he had the day before, that Bucher be fired.  Jeff responded that he would convince him not to fire Bucher.

169.    Bucher asked what he would do if he couldn't convince Steve Decker that Bucher shouldn't be fired.  Jeff Zaiger said that he didn't think it would come to that.

170.    Bucher stated:  "Look, this seems like simple math here. A + B = C. You just told me you have to do whatever Black Diamond asks. Steve said yesterday on the phone he wants you to fire me. So doesn't that mean I'm getting fired?"  Jeff admitted: "I get your logic."

171.    Following the February 27, 2023, meeting, Bucher had serious concerns about Jeff Zaiger's ability to carry out his ethical obligations to clients.

172.    Bucher was concerned that, if Black Diamond continued to demand it, Jeff Zaiger would terminate Bucher's employment regardless of what was best for the 48,000 Steam Mass Arbitration clients.  Given that Bucher was the architect of the mass arbitration strategies and the

27

only attorney at Zaiger LLC with consumer or mass arbitration experience, his absence would leave the Steam Mass Arbitration clients without competent representation.

173.    Bucher was also concerned that, given the complete financial control and dominion Black Diamond had over Zaiger LLC and Jeff Zaiger, Black Diamond would gain *de facto* control over important legal decisions in the Steam Mass Arbitration cases, including whether or not those cases should proceed (or the clients abandoned) if Valve paid its filing fees.

174.    Bucher was also concerned that Jeff Zaiger might terminate all 48,000 Steam Mass Arbitration clients if Black Diamond demanded he do so and refocus the firm on doing only work for Black Diamond.

175.    Upon information and belief, by at least February 27, 2023, if not earlier, Zaiger LLC and Jeff Zaiger had abdicated all decision-making associated with the Steam Mass Arbitration cases and due to the coercive power and control that Black Diamond had over them, had resolved to do anything Black Diamond asked, including abandoning all Steam Mass Arbitration clients if Valve did not agree to an early settlement and instead paid its initial arbitration filing fees.

**e.   Zaiger LLC Terminates Bucher On February 28, 2023**

176.    The evening of February 27, 2023, Jeff Zaiger informed Bucher that the morning of February 28, Deckoff, Nahas and Goldfarb would be holding a meeting to decide how they were going to direct Jeff Zaiger to handle "the situation" with the Steam Mass Arbitration cases.  Jeff Zaiger stated he would call Bucher after the meeting to inform him of Black Diamond's decision.

177.    On February 28, 2023, during the day, Bucher tried to reach Jeff Zaiger by phone numerous times to receive an update on his discussions with Black Diamond, but Jeff Zaiger refused Bucher's calls.  But through the afternoon, Jeff Zaiger sent Bucher erratic and somewhat

unhinged text messages: At 12:28 PM–"I'm kicking and screaming, Will … see your calling"; At 3:16 PM–"Three words: losing my mind"; At 4:47 PM–"Will: I'm fighting for my life today – please give me a fucking beat."

178.    Given Jeff Zaiger's statements the day before, Jeff Zaiger's lack of responsiveness to Bucher's calls that day, and Jeff Zaiger's text messages indicating Jeff Zaiger's "losing my mind" mental state, Bucher began to grow even more concerned about what might happen to the Steam Mass Arbitration clients and whether the firm would discharge its ethical duty to serve those clients.

179.    Further, it was apparent that Black Diamond's concerted campaign and unrelenting pressure on Zaiger LLC and Jeff Zaiger to terminate Bucher was likely to be successful given Black Diamond's complete control over Jeff Zaiger and Zaiger LLC and that therefore Bucher's termination was imminent. Bucher was aware that he had an independent ethical duty to notify the 48,000 Steam Mass Arbitration clients that he would no longer be their lawyer at Zaiger LLC, that he remained willing to represent them, and the means by which they could make an informed choice to switch counsel.

180.    Bucher promptly took steps to safeguard his client's interests, to preserve the status quo until it was clear what was going on, and to provide Jeff Zaiger with an opportunity to return to a calm mental state in which he was no longer "losing [his] mind," "kicking and screaming," or fighting for [his] life," before making any major decisions.

181.    First, Bucher attempted to download a list of clients and their contact information from the CRM software platform Bucher had set up for the clients.

29

182.    That attempt was unsuccessful, so he contacted Jeff Wettstein ("Wettstein"), the Chief Technology Officer of the CRM software platform, for assistance. He did not immediately receive a response from Wettstein.

183.    Next, Bucher temporarily adjusted Jeff Zaiger's administrative privileges on the CRM software platform to prevent Jeff Zaiger from taking any massive and irreversible actions without a cooling off period.

184.    Following these changes, Jeff Zaiger still had full access to the system. Jeff Zaiger could still read and send emails to clients, review files, create documents, send texts, send documents, review client uploads, answer client questions, and even terminate clients.

185.    What Bucher temporarily ensured that Jeff Zaiger could no longer do while he was "losing [his] mind" was take mass actions, such as terminating all clients or deleting all data, without first contacting Bucher or Wettstein to do so.

186.    Jeff Zaiger continued to refuse Bucher's calls throughout the evening.

187.    At 8:00 PM on February 28, 2023, Jeff Zaiger called Bucher. Jeff Zaiger sounded angry and unstable. He said: "I fought for you but I have to terminate you. You get quantum meruit and that's it."

188.    Bucher asked Jeff Zaiger to calm down and then come over to his apartment so they could discuss his termination.

189.    Jeff Zaiger and Linden arrived shortly afterwards that evening at Bucher's apartment.

190.    Jeff Zaiger stated that he'd spent all day pleading with Goldfarb, Nahas, and Deckoff to try to keep Bucher at the firm. Jeff Zaiger said he expressed to Black Diamond that

their insistence on firing Bucher didn't make practical sense, given Bucher's necessary expertise on mass arbitration matters.

191.    Jeff Zaiger stated: "Black Diamond said they weren't funding if Will is part of this and we are going to aggressively pursue all of our legal rights against all of you."   Bucher understood this to mean that Black Diamond had threatened to sue Zaiger LLC, Bucher, and Jeff Zaiger if they did not terminate Bucher.

192.    Jeff Zaiger said he spent more than eight hours going between Deckoff, Nahas, and Goldfarb, but that they were "unflappable."

193.    Jeff Zaiger said it was an impossible situation, where he couldn't get funding from Black Diamond without firing Bucher and couldn't get funding from the Alternative Funder without being sued by Black Diamond.

194.    Jeff Zaiger said he needed comfort that Bucher wasn't going to "steal Black Diamond's" Steam Mass Arbitration clients.

195.    Bucher responded that he hoped they could work out a co-counsel relationship and both Zaiger LLC and Bucher would continue to serve the clients, but if that wasn't possible, it would be the client's choice whom to go with.

196.    Bucher expressed that he was shocked by the termination because he accomplished exactly what he set out to accomplish and had provided exemplary service to Zaiger LLC.  Jeff Zaiger agreed that he had, and confirmed that Bucher's termination was not for cause and through no fault of Bucher's.

197.    Jeff Zaiger stated that the personalities just got "crosswise" with Black Diamond, "they are pissed at you," and that the reason for Bucher's termination "was just a personality clash, and not with me."

198.    Jeff Zaiger expressed that he thought Bucher's skill set was very marketable and he'd be able to deploy them elsewhere to make money.  Bucher responded that his skills weren't the question. The question was how he was supposed to apply those skills if they were "snuffed out by nothing."  Jeff Zaiger responded that Bucher's skills were "snuffed out because of Black Diamond."

199.    Bucher asked Jeff Zaiger what Jeff Zaiger believed was a fair percentage of fees Bucher should receive for his work on the Steam Mass Arbitration cases.  Jeff Zaiger responded that he'd have to think on it, but that there was a binding contract that entitled Bucher to the *quantum meruit* value of his contributions.

200.    Bucher proposed that he receive 45% of fees given his contributions.

201.    Jeff Zaiger responded that Black Diamond would never agree to a split like that because during the meetings that day they had said to him that had they known Jeff Zaiger gave Bucher a 50% share, they never would have agreed to fund the venture.

202.    Jeff Zaiger said if Bucher was thinking of getting anywhere close to 50% as his residual interest post-termination, Black Diamond wouldn't fund these clients, because Black Diamond didn't want Bucher to get such a high share.

203.    Bucher asked why Black Diamond would be privy to the manner in which Jeff Zaiger, Zaiger LLC and Bucher split any fees from the Steam Mass Arbitration claims given that

Black Diamond was not the client on these claims and the percentage of legal fees that Bucher received in relation to Jeff Zaiger did not affect Black Diamond's economic interests in any way.

204.    Jeff Zaiger said that Zaiger LLC was required to be completely transparent with Black Diamond about its financial arrangements, economic decisions and business decisions by virtue of its special relationship with Black Diamond and could not be seen as "keeping secrets." Jeff Zaiger further stated that Black Diamond's right to know arose from the fact that Black Diamond essentially "set up" or created Zaiger LLC, that the two entities are completely intertwined, and Black Diamond has control over Zaiger LLC's physical office space, electronic systems, bank accounts, and finances.

205.    Bucher asked if his termination was effective immediately.  Jeff Zaiger confirmed that it was, at Black Diamond's insistence.  Jeff Zaiger further stated that Bucher would likely be cut off from Zaiger LLC email shortly, if he hadn't been already, and that Black Diamond controlled Zaiger LLC's email servers.

206.    Jeff Zaiger also stated he brought all the arguments he could think of to keep Bucher, but that ultimately he feared that he was going to be fired himself by Black Diamond if he kept advocating for Bucher.

207.    Jeff Zaiger and Linden left Bucher's apartment at the end of the conversation.

208.    Later that evening, Jeff Zaiger called Bucher, angry, and stated that Bucher had locked him out of the CRM software for the Steam Mass Arbitration clients.  Bucher responded that he had not locked Jeff Zaiger out of the system but had temporarily suspended his ability to make irrevocable global changes to the database, stated that all access would be restored, and suggested they discuss any other concerns in the morning.

209.    Upon information and belief, on February 28, 2023, Nahas, Deckoff and Goldfarb demanded that Zaiger LLC and Jeff Zaiger terminate Bucher immediately, *i.e.*, that very day.  They threatened that if Zaiger LLC and Jeff Zaiger refused to comply with their demand, Black Diamond would withdraw all business from Zaiger LLC, cut off all support for Zaiger LLC's electronic systems, including its email systems, require Zaiger LLC to vacates its physical offices, and take legal action against Zaiger LLC and Jeff Zaiger.  They further demanded that Zaiger LLC breach its agreement to provide Bucher 50% of any fees from the Steam Mass Arbitration claims or anything approaching the *quantum meruit* value of Bucher's contributions.   They further threatened to freeze the $1.2 million of Jeff Zaiger's personal funds held by Black Diamond.

**f.   March 1, 2023, Meeting At Bucher's Apartment**

210.    Jeff Zaiger arrived at Bucher's apartment building around 11:30 AM on March 1, 2023, and delivered a letter purporting to terminate Bucher "for cause."

211.    The letter cited Bucher's efforts to download a list of his clients with contact information and efforts to safeguard the system during the period of time where Jeff Zaiger was "losing [his] mind" as the pretense for Bucher's termination.

212.    Incredibly, despite weeks of criticism from Black Diamond, hours of discussion and insistence from Deckoff that Bucher be fired, and the hour-long discussion the night prior in which Bucher was informed he was terminated, the letter made no mention of those facts.

213.    At approximately 1:00 PM that day, Bucher provided Zaiger LLC with all passwords needed to manage the advertising accounts, website, and other software and systems Bucher had set up during his time at Zaiger LLC.

**Zaiger LLC Continues Soliciting Clients With Bucher's Name And Likeness**

214.     Zaiger LLC had full control over the advertising and websites as of no later than 2:00 PM on March 1, 2023.

215.     Following Bucher's termination, Zaiger LLC continued to run video advertisements on YouTube and Instagram featuring Bucher, representing that he was a lawyer at Zaiger LLC, and inviting potential clients to see if they were eligible to file a claim.

216.     It took days following Bucher's departure before references to Bucher were removed from the steamclaims.com homepage, which is what a user sees if they directly go to the website created to recruit clients.

217.     But even once references were removed from the homepage, for weeks following Bucher's departure, subdomains of steamclaims.com continued to feature photos of Bucher.

218.     But even once references were removed from the homepage, for weeks following Bucher's departure, subdomains of steamclaims.com continued to feature a video of Bucher explaining the legal merits of the Valve case.

219.     Further, for weeks following Bucher's departure, subdomains of steamclaims.com, including steamclaims.com/file and steamclaims.com/max, continued to note "Jeffrey Zaiger, nine-time 'Super Lawyer' and 'New York Rising Star,' has teamed up with Bucher, chair of the American Bar Association's Digital Games and New Media Committee and Video Game Bar Association member to bring these antitrust claims against Valve. Together, we will negotiate, and if necessary litigate, your claim."

220.     One of these subdomains was steamclaims.com/file.

221.    When Zaiger LLC runs an advertisement on Google Search, clients are directed to steamclaims.com/file and are not directed to steamclaims.com.

222.    Another of these subdomains was steamclaims.com/max.

223.    On information and belief, when Zaiger LLC runs an advertisement through its marketing firm, clients are directed to steamclaims.com/max and are not directed to steamclaims.com

224.    As a result, after Bucher's departure, potential clients who clicked on an advertisement on Google or displayed through Zaiger LLC's marketing firm were led to a page that misled them into believing that Bucher would be handling their case.

225.    Zaiger LLC knew how to, and did, make adjustments to the homepage steamclaims.com.

226.    But Zaiger LLC left the subdomains, to which potential clients are actually directed, with references to Bucher.

227.    Potential clients who are eligible receive an email with instructions on how to sign the retainer agreement.

228.    Following Bucher's termination, that email continued to include Bucher's signature block.

229.    Potential clients who are eligible to file a claim receive a reminder text message if they have not completed their retainer agreement.

230.    Until at least March 23, 2023, three weeks following Bucher's termination, that reminder text message stated "Hey [client name], its Will from Zaiger LLC. We'd love to get you

compensated, but we need a signed retainer agreement to get started. You can sign on your phone here: [link to retainer]. It only takes a minute!"

231. No employee other than Bucher, past or present, is named Will.

**ZAIGER LLC AND JEFF ZAIGER SEND A MISLEADING UNILATERAL COMMUNICATION TO THE STEAM MASS ARBITRATION CLIENTS AND VIOLATE THEIR ETHICAL DUTY TO PROVIDE BUCHER A COPY OF THE STEAM MASS ARBITRATION CLIENT LIST**

232. Following his termination, Bucher expressed a preference to Zaiger LLC and Jeff Zaiger for continuing to serve the clients jointly through a co-counsel relationship.

233. While Bucher was under the impression that Zaiger LLC was considering a co-counsel relationship, on March 25, 2023, Zaiger LLC unilaterally sent an email to clients informing them that Bucher was no longer representing them.

234. The communication included no information on how to contact Bucher, his new firm, his willingness to continue to represent the clients, or their right to make a choice as to whom to retain as counsel.

235. Bucher requested a complete list of all the Steam Mass Arbitration clients so he could fulfil his duty to notify clients that he had moved firms, was willing to still represent them, and give them a choice between retaining Bucher as lead counsel at his new firm, remaining with Zaiger LLC, or choosing new counsel entirely.

236. Zaiger LLC refused to provide a contact list of Bucher's clients to him.

237. Bucher has an outdated list of his clients, which he is attempting to use to fulfil his ethical obligation to provide his clients notice of his departure and to make an informed choice about whether to keep Bucher as their lead counsel, stay with Zaiger LLC, or choose new counsel entirely.

238.     Because that list is outdated, there are more than 14,000 clients who have not been informed that they have a choice of counsel and can continue to be represented by Bucher if they choose and for whom Bucher has no means of contact.

## FIRST COUNT - BREACH OF WRITTEN CONTRACT
### (Against Zaiger LLC)

239.     Plaintiff hereby incorporates by reference each and every allegation in paragraphs 1 through 238 of this complaint as though said paragraphs were fully set forth herein.

240.     On or around July 27, 2022, Bucher and Zaiger LLC entered into the Employment Agreement.  A true and correct copy of the Employment Agreement is attached as Exhibit **A**.

241.     The Employment Agreement states that Zaiger LLC is hiring Bucher to "lead the Firm's development and pursuit of mass arbitration strategies."

242.     The Employment Agreement provides that Zaiger LLC will compensate Bucher by, among other things, paying him an allocation of fees received from any mass arbitration strategies equal to the fees Zaiger LLC pays to Jeffrey Zaiger.

243.     Bucher performed all of his obligations under the Employment Agreement.  Among other things, he spent over 1,300 hours working on the mass arbitration strategies.

244.     Bucher did not take any action that would have justified Zaiger LLC to terminate him with cause.

245.     On February 28, 2023, Zaiger LLC terminated Bucher without cause.

246.     The Employment Agreement provides that if Zaiger LLC terminates Bucher without cause, Zaiger LLC must pay Bucher the quantum meruit value of his work on the mass arbitration cases, even if any revenue from these cases is received after Bucher's termination.

247.     During Bucher's time at Zaiger LLC, in the 1,300 hours he worked on mass arbitration strategies, he completely set up the infrastructure and procedures to take on tens of thousands of clients in mass arbitration.  Further, Bucher was responsible, from ideation through obtaining over 48,000 clients, for the Steam Mass Arbitration claims as reflected in the intake website www.steamclaims.com.

248.     Zaiger LLC, in internal metrics and calculations, reasonably estimated the total settlement value associated with the clients that Bucher was responsible for bringing into the firm at $48 million to $129.6 million.  Of that amount, Zaiger LLC stands to receive $19.2 million to $51.84 million in fees.

249.     From a narrow view of just the 48,000 claims for which Bucher was responsible, beyond the 1,300 hours spent by Bucher, Zaiger will need to perform minimal additional work to obtain an economic recovery.  This is because the economics of mass arbitration cases are such that defendants are strongly incentivized to settle them either before filing or immediately after them to avoid crippling arbitral filing fees on tens of thousands of cases.  Under a quantum meruit measure, Bucher is entitled to at least 45 percent of any fees received by Zaiger LLC associated with these clients, *i.e.*, $8.64 million to $23.33 million.

250.     But the quantum meruit value of Bucher's services associated with the Steam Mass Arbitration claims is at least twice as much.  This is because Zaiger LLC was projecting to acquire over 100,000 clients with the infrastructure that Bucher established at Zaiger LLC during his time there.  Zaiger LLC is projected to recover fees of 40 million to 108 million dollars from these cases, of which, at a 45% quantum meruit calculation, Bucher would be entitled to $18 million to $48.6 million dollars.

251.    Zaiger LLC breached the Employment Agreement by repudiating its obligation to pay Bucher the compensation owed under the Employment Agreement.

252.    As a proximate result of Zaiger LLC's breach of the Employment Agreement, Bucher has suffered damages to be proven at trial but no less than $18 million.

WHEREFORE plaintiff Bucher prays for relief as set forth below.

### SECOND COUNT - INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Black Diamond and Deckoff)

253.    Plaintiff hereby incorporates by reference each and every allegation in paragraphs 1 through 252 of this complaint as though said paragraphs were fully set forth herein.

254.    On or around July 27, 2022, Bucher and Zaiger LLC entered into the Employment Agreement.  A true and correct copy of the Employment Agreement is attached as Exhibit **A**.

255.    The Employment Agreement states that Zaiger LLC is hiring Bucher to "lead the Firm's development and pursuit of mass arbitration strategies."

256.    The Employment Agreement provides that Zaiger LLC will compensate Bucher by, among other things, paying him an allocation of fees received from any mass arbitration strategies equal to the fees Zaiger LLC pays to Jeffrey Zaiger.

257.    Black Diamond and Deckoff were aware of the contractual relationship between Zaiger LLC and Bucher under the Employment Agreement.

258.    Black Diamond and Deckoff intended to interfere with the contractual relationship between Zaiger LLC and Bucher under the Employment Agreement.

259.     Black Diamond and Deckoff tortiously interfered with the Employment Agreement.  Among other things, they used their undue influence and economic power over Zaiger LLC and Jeffrey Zaiger to induce Zaiger LLC to breach the Employment Agreement.

260.     Zaiger LLC had acquired approximately 48,000 clients at the time it terminated Bucher and was projected to acquire 100,000 clients.  Zaiger expected to realize fees associated with these claims of between 40 million to 108 million dollars, of which Bucher was entitled to a 50/50 allocation with Jeffrey Zaiger, *i.e.*, 20 million to 54 million dollars.

261.     Moreover, the Employment Agreement contemplated that Bucher would continue to pursue mass arbitration strategies beyond the Steam Mass Arbitration cases.  Bucher reasonably expected hundreds of millions of dollars of future fees allocated to him under the Employment Agreement.

262.     As a proximate result of Black Diamond and Deckoff's tortious interference with the Employment Agreement, Bucher has suffered damages to be proven at trial but no less than 100 million dollars.

263.     Furthermore, Bucher is informed and believes, and on that basis alleges, that Black Diamond's and Deckoff's conduct was undertaken with evil motive, a reckless indifference to the rights of others, and intent to cause wanton and malicious injury, such that punitive damages should be awarded.

WHEREFORE plaintiff Bucher prays for relief as set forth below.

### THIRD COUNT - BREACH OF WRITTEN CONTRACT
### (Against Zaiger LLC And Jeffrey Zaiger)

264.     Plaintiffs hereby incorporate by reference each and every allegation in paragraphs 1 through 263 of this complaint as though said paragraphs were fully set forth herein.

265.    On October 28, 2022, Bucher, Zaiger LLC and Jeffrey Zaiger entered into the Partnership and Compensation Agreement.  A true and correct copy of this agreement is attached as Exhibit **B**.

266.    The Partnership and Compensation Agreement provides that Bucher, Zaiger LLC and Jeffrey Zaiger intend to pursue mass arbitration strategies with Black Diamond over the course of 4 years or longer.

267.    The Partnership and Compensation Agreement provides that Bucher will receive 50% of the fees received by Zaiger LLC from any mass arbitration strategies pursued by the firm over the next 4 years irrespective of Mr. Bucher's employment status.

268.    Bucher performed all of his obligations under the Employment Agreement.

269.    Bucher did not take any action that would have justified Zaiger LLC to terminate him with cause.

270.    On February 28, 2023, Zaiger LLC terminated Bucher without cause.

271.    Per the terms of the Partnership and Compensation Agreement, Bucher is entitled to 50% of Zaiger LLC's fees from mass arbitration cases for the period of October 28, 2022, through October 28, 2026.

272.    Zaiger LLC, in internal metrics and calculations, Zaiger LLC was projecting to acquire over 100,000 clients with the infrastructure that Bucher established.  Zaiger LLC projected that it would recover fees of 40 million to 108 million dollars from these cases, of which Bucher would be entitled to 20 million to 54 million dollars.

273.    And this is only for the Steam Mass Arbitration claims. With the infrastructure Bucher developed, Zaiger LLC is likely to generate revenue from additional mass arbitration strategies over the next 4 years.

274.    Zaiger LLC and Jeffrey Zaiger breached the Partnership and Compensation Agreement by repudiating their obligation to pay Bucher the compensation owed under the Partnership and Compensation Agreement.

275.    As a proximate result of Zaiger LLC's and Jeffrey Zaiger's breach of the Partnership and Compensation Agreement, Bucher has suffered damages to be proven at trial but no less than 20 million dollars.

WHEREFORE plaintiff Bucher prays for relief as set forth below.

### FOURTH COUNT - INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Black Diamond and Deckoff)

276.    Plaintiff hereby incorporates by reference each and every allegation in paragraphs 1 through 275 of this complaint as though said paragraphs were fully set forth herein.

277.    On October 28, 2022, Bucher, Zaiger LLC and Jeffrey Zaiger entered into the Partnership and Compensation Agreement. A true and correct copy of this agreement is attached as Exhibit **B**.

278.    The Partnership and Compensation Agreement provides that Bucher, Zaiger LLC and Jeffrey Zaiger intend to pursue mass arbitration strategies with Black Diamond over the course of 4 years or longer.

279.    The Partnership and Compensation Agreement provides that Bucher will receive 50% of the fees received by Zaiger LLC from any mass arbitration strategies pursued by the firm over the next 4 years irrespective of Bucher's employment status.

280.    Black Diamond and Deckoff were aware of the contractual relationship between Zaiger LLC and Bucher under the Partnership and Compensation Agreement.

281.    Black Diamond and Deckoff intended to interfere with the contractual relationship between Bucher, Zaiger LLC and Jeffrey Zaiger under the Partnership and Compensation Agreement.

282.    Black Diamond and Deckoff tortiously interfered with the Partnership and Compensation Agreement.  Among other things, they used their undue influence and economic power over Zaiger LLC and Jeffrey Zaiger to induce them to breach the Partnership and Compensation Agreement.

283.    Per the terms of the Partnership and Compensation Agreement, Bucher is entitled to 50% of Zaiger LLC's fees from mass arbitration cases for the period of October 28, 2022, through October 28, 2026.

284.    Zaiger LLC, in internal metrics and calculations, was projecting to acquire over 100,000 clients with the infrastructure that Bucher established.  Zaiger LLC is projected to recover fees of $40 million to $108 million dollars from these cases, of which Bucher would be entitled to $20 million to $54 million dollars.

285.    And this is only for the Steam mass arbitration claims.  With the infrastructure Bucher developed, Zaiger LLC is likely to generate revenue from additional mass arbitration strategies over the next 4 years.

286.    As a proximate result of Black Diamond's and Deckoff's tortious interference with the Partnership and Compensation Agreement, Bucher has suffered damages to be proven at trial but no less than $20 million.

287.    Furthermore, Bucher is informed and believes, and on that basis alleges, that Black Diamond's and Deckoff's conduct was undertaken with evil motive, a reckless indifference to the rights of others, and intent to cause wanton and malicious injury, such that punitive damages should be awarded.

WHEREFORE plaintiff Bucher prays for relief as set forth below.

**FIFTH COUNT - TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES**
**(Against Black Diamond and Deckoff)**

288.    Plaintiff hereby incorporates by reference each and every allegation in paragraphs 1 through 278 of this complaint as though said paragraphs were fully set forth herein.

289.    On or around July 27, 2022, Bucher and Zaiger LLC entered into the Employment Agreement.  A true and correct copy of the Employment Agreement is attached as Exhibit **A**.

290.    The Employment Agreement states that Zaiger LLC is hiring Bucher to "lead the Firm's development and pursuit of mass arbitration strategies."

291.    The Employment Agreement provides that Zaiger LLC will compensate Bucher by, among other things, paying him an allocation of fees received from any mass arbitration strategies equal to the fees Zaiger LLC pays to Jeffrey Zaiger.

292.    On October 28, 2022, Bucher, Zaiger LLC and Jeffrey Zaiger entered into the Partnership and Compensation Agreement.

293.    The Partnership and Compensation Agreement provides that Bucher, Zaiger LLC and Jeffrey Zaiger intend to pursue mass arbitration strategies with Black Diamond over the course of 4 years or longer.

294.    The Partnership and Compensation Agreement provides that Bucher will receive 50% of the fees received by Zaiger LLC from any mass arbitration strategies pursued by the firm over the next 4 years irrespective of Bucher's employment status.

295.    Bucher, Zaiger LLC and Jeffrey Zaiger had a business relationship to pursue mass arbitration strategies.

296.    Black Diamond LLC and Deckoff were aware of the business relationship between Bucher, Zaiger LLC and Jeffrey Zaiger.

297.    Black Diamond LLC and Deckoff knowingly interfered with the business relationship between Bucher, Zaiger LLC and Jeffrey Zaiger. Among other things, Black Diamond and Deckoff used their undue influence and economic power over Zaiger LLC and Jeffrey Zaiger to interfere with their business relationship with Bucher.

298.    Bucher stood to receive hundreds of millions of dollars from the business relationship and has suffered actual losses from Black Diamond's and Deckoff's interference with his business expectancies.

299.    As a proximate result of Black Diamond's and Deckoff's tortious interference with Bucher's business expectancies, Bucher has suffered damages to be proven at trial but not less than 100 million dollars.

300.    Furthermore, Bucher is informed and believes, and on that basis alleges, that Black Diamond's and Deckoff's conduct was undertaken with evil motive, a reckless indifference to the

rights of others, and intent to cause wanton and malicious injury, such that punitive damages should be awarded.

WHEREFORE plaintiff Bucher prays for relief as set forth below.

## SIXTH COUNT - FEDERAL FALSE ADVERTISING AND UNFAIR COMPETITION, 15 U.S.C. § 1125(a)
### (Against Zaiger LLC And Jeff Zaiger)

301.    Plaintiff hereby incorporates by reference each and every allegation in paragraphs 1 through 300 of this complaint as though said paragraphs were fully set forth herein.

302.    Zaiger LLC and Jeff Zaiger's actions described above and specifically, without limitation, their continued use of Bucher's likeness and explicit reference to Bucher in advertising to recruit new mass arbitration clients even after Bucher's termination, their refusal to provide Bucher a list of Steam Mass Arbitration clients that Bucher represented at the time he was employed by Zaiger LLC, and their failure to provide the Steam Mass Arbitration clients with sufficient information to make an informed choice of counsel, including the misleading unilateral communication sent by Zaiger LLC and Jeff Zaiger on March 25, 2023, constitute unfair competition and false advertising in violation of 15 U.S.C. § 1125(a).

303.    Consumers are likely to be misled and deceived by Zaiger LLC's and Jeff Zaiger's misrepresentations, material omissions, and failure to provide a client list to Bucher such that he can provide corrective information.

304.    Zaiger LLC and Jeff Zaiger knew or should have known that that their statements, omissions and conduct were likely to mislead.

305.    As an actual and proximate result of Zaiger LLC's and Jeff Zaiger's willful and intentional actions, Bucher has suffered damages in an amount to be determined at trial, and unless

Zaiger LLC and Jeff Zaiger are enjoined, Bucher will continue to suffer irreparable harm and damage to his business, reputation, and goodwill.

306.    Pursuant to 15 U.S.C. § 1117, Bucher is entitled to damages for Zaiger LLC's and Jeff Zaiger's Lanham Act violations, an accounting for profits made by Zaiger LLC and Jeff Zaiger on the Steam Mass Arbitration claims, as well as recovery of the costs of this action. Furthermore, Bucher is informed and believes, and on that basis alleges, that Zaiger LLC's and Jeff Zaiger's conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Bucher to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

WHEREFORE plaintiff Bucher prays for relief as set forth below.

**SEVENTH COUNT - CONNECTICUT UNFAIR TRADE PRACTICES ACT, SEC. 42-110a, ET. SEQ.**
**(Against Zaiger LLC And Jeff Zaiger)**

307.    Plaintiff hereby incorporates by reference each and every allegation in paragraphs 1 through 306 of this complaint as though said paragraphs were fully set forth herein.

308.    Zaiger LLC and Jeff Zaiger's actions described above and specifically, without limitation, their continued use of Bucher's likeness and explicit reference to Bucher in advertising to recruit new mass arbitration clients even after Bucher's termination, their refusal to provide Bucher a list of Steam Mass Arbitration clients that Bucher represented at the time he was employed by Zaiger LLC, and their failure to provide the Steam Mass Arbitration clients with sufficient information to make an informed choice of counsel, including the misleading unilateral solicitation sent by Zaiger LLC and Jeff Zaiger on March 25, 2023, constitute unfair competition

and unfair and deceptive trade practices in violation of the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. Sec. 42-110a, et. seq.

309. Clients are likely to be misled and deceived by Zaiger LLC's and Jeff Zaiger's misrepresentations, material omissions, and failure to provide a client list to Bucher such that he can provide corrective information.

310. Zaiger LLC and Jeff Zaiger knew or should have known that that their statements, omissions and conduct were likely to mislead.

311. As an actual and proximate result of Zaiger LLC's and Jeff Zaiger's willful and intentional actions, Bucher has suffered actual damages in an amount to be determined at trial, and unless Zaiger LLC and Jeff Zaiger are enjoined, Bucher will continue to suffer irreparable harm and damage to his business, reputation, and goodwill.

312. Pursuant to Conn.Gen.Stat. Sec. 42-110g, Bucher is entitled to damages for Zaiger LLC's and Jeff Zaiger's acts, as well as recovery of the costs of this action and reasonable attorneys' fees incurred in bringing this action. Furthermore, Bucher is informed and believes, and on that basis alleges, that Zaiger LLC's and Jeff Zaiger's conduct was undertaken with evil motive, a reckless indifference to the rights of others, and intent to cause wanton and malicious injury, such that punitive damages should be awarded pursuant to Conn.Gen.Stat. Sec. 42-110g(a).

WHEREFORE plaintiff Bucher prays for relief as set forth below.

## EIGHTH COUNT - WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (Against Zaiger LLC)

313. Plaintiff hereby incorporates by reference each and every allegation in paragraphs 1 through 312 of this complaint as though said paragraphs were fully set forth herein.

49

314.     On or about August 15, 2022, Bucher commenced employment with Zaiger LLC.

315.     In or about January 2023 and February 2023, Bucher learned that Black Diamond and Deckoff were insisting that Zaiger LLC, Zaiger, and Bucher cease representing their clients in the Steam Mass Arbitration claims if the cases do not settle immediately upon filing.

316.     On multiple occasions, Bucher expressed ethical concerns with the demands of Black Diamond and Deckoff and with accepting funding from Black Diamond, including that this presented a conflict of interest and violated other Connecticut Rules of Professional Conduct.

317.     On February 28, 2023, Zaiger LLC terminated Bucher's employment.

318.     Upon information and belief, Zaiger LLC terminated Bucher because he refused to go along with the severe breaches of professional ethics demanded by Black Diamond and Deckoff, and by extension Zaiger LLC and because he expressed concerns about these issues.

319.     Zaiger LLC's termination of Bucher was wrongful and in violation of public policy, which public policy is reflected by numerous provisions of the Connecticut Rules of Professional Conduct.

320.     For example, Rule 1.2(c) requires that for a limited scope representation, a client must give informed consent. Following Bucher's departure, Zaiger LLC is intending to provide a limited scope representation to clients in the Mass Steam Arbitration claims (i.e. only represent them until filing of the arbitration and then withdrawing). But this intent was being hidden from clients and no informed consent was being obtained.

321.     In addition, Rule 1.3 requires a lawyer to "act with reasonable diligence and promptness in representing a client." This includes "tak[ing] whatever lawful and ethical measures are required to vindicate a client's cause or endeavor" and, unless a lawyer properly withdraws,

"carry[ing] through to conclusion all matters undertaken for a client." Here, however, Zaiger LLC is not intending to take all lawful and ethical measures are necessary for the Steam Mass Arbitration clients and, following Bucher's departure, no longer intends to see those arbitrations through to conclusion.

322.    Further, Rule 1.7(a)(2) requires a lawyer to decline a representation due to conflict of interest where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Here, Zaiger LLC's economic dependence on Black Diamond, together with Black Diamond's demand to control how Zaiger LLC would prosecute the Steam Arbitration claims created a clear conflict of interest.

323.    Moreover, 5.4(c) prohibits a lawyer from "permit[ting] a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services." Here, Zaiger LLC was intending to accept payment from Black Diamond for legal services pertaining to the Steam Mass Arbitrations, while allowing Black Diamond to regulate hiring and firing of attorneys, litigation strategy, and even when Zaiger LLC must withdraw from representing the Steam Arbitration clients.

324.    Similarly, Rule 5.4(d) prohibits a lawyer from "practic[ing] with or in the form of a professional corporation or association authorized to practice law for a profit, if . . . [a] nonlawyer has the right to direct or control the professional judgment of a lawyer." Here, Zaiger LLC was practicing law while allowing Black Diamond (a non-lawyer) to direct or control Zaiger LLC's professional judgment.

325.     Bucher has lost and will continue to lose earnings and benefits, his earning capacity has been substantially impaired, he has lost and will continue to suffer from humiliation and emotional injuries and distress, he has and will continue to incur litigation expenses and attorney's fees and the quality of his life has been substantially diminished, all to his loss and detriment.

326.     Zaiger LLC's conduct shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. As such, Bucher is entitled to punitive and exemplary damages.

### NINTH COUNT- COMMON LAW RIGHT OF PUBLICITY

### (Against Zaiger LLC and Jeff Zaiger)

327.     Plaintiff hereby incorporates by reference each and every allegation in paragraphs 1 through 326 of this complaint as though said paragraphs were fully set forth herein.

328.     On or about August 15, 2022, Bucher commenced employment with Zaiger LLC.

329.     On February 28, 2023, Zaiger LLC terminated Bucher's employment.

330.     After February 28, 2023, Zaiger LLC and Jeff Zaiger continued to use Bucher's name and likeness for commercial purposes to benefit Zaiger LLC and Jeff Zaiger.  In particular, they continued to use Bucher's name and likeness on social media marketing campaigns and websites to aid in new client solicitation.  Zaiger LLC and Jeff Zaiger also continue the use of Bucher's name and likeness to aid in client retention.  Zaiger LLC and Jeff Zaiger did not notify the Steam Mass Arbitration clients that Bucher was no longer with Zaiger LLC for nearly a month and that communication failed to disclose sufficient information to allow the clients to make an informed choice of whether to remain with Zaiger LLC or retain Bucher, or even that they had a choice.  The unilateral client communication sent on March 25, 2023, did not end the harm from

Zaiger LLC's and Jeff Zaiger's invasion of Bucher's right of publicity but instead served to entrench those harms and retain the commercial benefits from their wrongdoing.

331.   Further, Zaiger LLC's and Jeff Zaiger's invasion of Bucher's right of publicity caused consumer confusion.

332.   Bucher has suffered actual damages proximately caused by Zaiger LLC's and Jeff Zaiger's invasion of his right to publicity in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully pray for judgment against defendant and in their favor as follows:

**On the First Count**

1.   For general and special damages in an amount to be proven at trial;

2.   For pre-judgment interest and post-judgment interest in an amount to be proven at trial;

3.   For costs of suit; and

4.   For such other and further relief as the Court deems just and proper.

**On the Second Count**

1.   For general and special damages in an amount to be proven at trial;

2.   For pre-judgment interest and post-judgment interest in an amount to be proven at trial;

3.   For costs of suit;

4.   For exemplary damages; and

5. For such other and further relief as the Court deems just and proper.

**On the Third Count**

1. For general and special damages in an amount to be proven at trial;

2. For pre-judgment interest and post-judgment interest in an amount to be proven at trial;

3. For costs of suit; and

4. For such other and further relief as the Court deems just and proper.

**On the Fourth Count**

1. For general and special damages in an amount to be proven at trial;

2. For pre-judgment interest and post-judgment interest in an amount to be proven at trial;

3. For costs of suit;

4. For exemplary damages; and

5. For such other and further relief as the Court deems just and proper.

**On the Fifth Count**

1. For general and special damages in an amount to be proven at trial;

2. For pre-judgment interest and post-judgment interest in an amount to be proven at trial;

3. For costs of suit;

4. For exemplary damages; and

5. For such other and further relief as the Court deems just and proper.

**On the Sixth Count**

1. For general and special damages in an amount to be proven at trial;

2. For pre-judgment interest and post-judgment interest in an amount to be proven at trial;

3. For costs of suit;

4. For preliminary and permanent injunctive relief;

5. For an accounting and disgorgement of profits;

6. For reasonable attorney's fees;

7. For exemplary damages; and

8. For such other and further relief as the Court deems just and proper.

**On the Seventh Count**

1. For general and special damages in an amount to be proven at trial;

2. For pre-judgment interest and post-judgment interest in an amount to be proven at trial;

3. For costs of suit;

4. For preliminary and permanent injunctive relief;

5. For reasonable attorney's fees, pursuant to Conn.Gen.Stat. Sec. 42-110g(d);

6. For punitive damages, pursuant to Conn.Gen.Stat. Sec. 42-110g(a); and

7. For such other and further relief as the Court deems just and proper.

**On the Eighth Count**

1. For general and special damages in an amount to be proven at trial;

2. For pre-judgment interest and post-judgment interest in an amount to be proven at trial;

3. For costs of suit;

4. For exemplary damages; and

5. For such other and further relief as the Court deems just and proper.

**On the Ninth Count**

1. For general and special damages in an amount to be proven at trial;

2. For pre-judgment interest and post-judgment interest in an amount to be proven at trial;

3. For costs of suit;

4. For exemplary damages; and

5. For such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all claims asserted herein.

**PLAINTIFF,**
**WILLIAM BUCHER**


By s/ William J. O'Sullivan (ct06482)
William J. O'Sullivan (ct06482)
O'Sullivan McCormack Jensen & Bliss PC
180 Glastonbury Boulevard, Suite 210
Glastonbury, CT 06033
Phone (860) 258-1993
Fax (860) 258-1991
wosullivan@omjblaw.com
His Attorneys

Dhaivat Shah, Esq. (Pro Hac Vice to follow)
David Siegel, Esq. (Pro Hac Vice to follow)
Grellas Shah LLP
20400 Stevens Creek Blvd.
Suite 280
Cupertino, CA 95014
Tel: 408-255-6310
Fax: 408-418-2536
ds@grellas.com
dsiegel@grellas.com
His Attorneys

# EXHIBIT A

**ZAIGER LLC**
2187 Atlantic Street, 9th Floor
Stamford, CT 06902

JEFFREY H. ZAIGER
DIRECT DIAL: (203) 347-7180
EMAIL: JZAIGER@ZAIGERLLC.COM

July 27, 2022

**<u>Via Email</u>**
William Ward Bucher IV
405 Atlantic St., Apt. 7M
Stamford, CT 06901
Email: <u>wustlwill@gmail.com</u>

     **Re:**    **<u>Offer of Employment</u>**

Dear Will:

     I am pleased to confirm an offer of employment at Zaiger LLC ("**Z LLC**" or the "**Firm**") to (i) lead the Firm's development and pursuit of mass arbitration strategies (the "Strategies"), and (ii) work on Z LLC's general litigation matters, as needed, at an hourly rate to be paid on a quarterly basis (the "General Litigation Work").

<u>Start date</u>:  August 11, 2022, or another mutually agreeable date

<u>Compensation (Two Components)</u>:

  (1) <u>Compensation for Work on the Strategies</u>

    (a) $12,500 per month ($150,000.00/yr. *annualized*)

    (b) A percentage or payout of Z LLC's return or other recovery from any cases pursued pursuant to the Strategies commensurate with any percentage, payout, or allocation to Jeff Zaiger; *provided, however,* that any percentage recovery to you shall be reduced by incremental costs borne by the Firm from your employment such as (i) additional licenses for the Firm's research subscriptions, document management platform, and timekeeping software; (ii) additional insurance; (iii) payment of any recruiter fee; and, (iv) your proportional share of the Firm's allocated quarterly expenses.

  (2) <u>Compensation for General Litigation Work</u>

    • $220 per hour (paid quarterly)

<u>Benefits</u>: Paid medical benefits on the same terms and conditions as offered to other employees of Z LLC.[1] Additionally, the Firm makes a 401(k)-benefit plan available to all employees including the potential for inclusion in the Firm's profit-sharing plan as well. The Firm also covers attorney registration costs, reasonable CLE-related costs, and membership to attorney-affiliated groups such as the Federal Bar Council. Additionally, daily lunches are provided for employees working out of the Firm's Stamford offices.

Your employment will be contingent upon the satisfactory completion of a background check (for which consent forms will be provided following your acceptance of this offer). This letter does not create any right to continued employment for any period of time. If you accept this offer, your employment with the Firm at all times will be "at will." This means that either you or the Firm may end your employment at any time for any or no reason, except that: (i) if the Firm terminates your employment, without cause, you will be entitled to compensation outlined in Compensation Section 1(b) for services rendered and work performed on cases pursued pursuant to the Strategies while employed, on a *quantum meruit* basis, even if applicable revenue is received from such cases after termination, and (ii) if you elect to terminate your employment with the Firm, without cause, then you shall forfeit the right to compensation outlined in Compensation Section 1(b); *provided, however*, that good faith discussions regarding resolution of any payment of compensation outlined in Compensation Section 1(b) shall occur in the event of either party terminating employment.

Please acknowledge your acceptance of this offer by signing below and returning a copy to Jeff Zaiger (jzaiger@zaigerllc.com) and Nancy DiDemetrio (ndidemetrio@bdcm.com) by Thursday, July 28, 2022. If you need additional time, please let me know.

Following receipt of your countersignature, we will also need a list of clients for whom you have worked over the course of your career in the unlikely event the Firm needs to erect any ethical walls.

Sincerely,

ZAIGER LLC

By: _____
Jeffrey H. Zaiger

Agreed and Accepted:

By: _____
Dated: 7/27/2022

---

[1]    Z LLC is offering its employees coverage under UnitedHealthcare Oxford Freedom Gold Plan.

2

# EXHIBIT B

## Partnership and Compensation Agreement

**WHEREAS**, Zaiger LLC ("Z LLC" or the "Firm"), Jeffrey Zaiger, and Will Bucher intend to pursue mass arbitration strategies (the "Strategies") with Black Diamond Capital Management L.L.C. or its affiliates ("Black Diamond") over the course of the next four years or longer;

**WHEREAS**, Black Diamond seeks assurance that Will Bucher will remain a part of the team of managing the Strategies and has requested he be a bound by any funding agreement entered into between Black Diamond and Z LLC;

**WHEREAS**, Will Bucher is currently an at will employee of Z LLC and unwilling to commit to a four year agreement without a guarantee of employment and compensation;

**WHEREAS**, Jeffrey Zaiger and Will Bucher intend to organize as a partnership between themselves and, at Judd Linden's option, Judd Linden, to ensure the continued commitment of themselves to the Strategies and ensure fair compensation for all involved;

**WHEREAS**, Jeffrey Zaiger and Will Bucher intend compensation in the partnership to reflect that in Will Bucher's current employment agreement, including a payout or percentage of any recovery from the Strategies equal to any percentage, payout, or allocation to Jeffrey Zaiger;

**WHEREAS**, Jeffrey Zaiger and Will Bucher would complete the organization of a partnership prior to entering into a funding agreement with Black Diamond but for the time involved in doing so, and the negative impact the corresponding delay would have on the ability to promptly pursue the Strategies;

Jeffrey Zaiger and Z LLC commit to compensate Will Bucher, regardless of employment status, with a payout or percentage of any recovery from the Strategies equal to any percentage, payout, or allocation due to Jeffrey Zaiger from the Strategies, or one-half the profit earned by Z LLC from the Strategies, whichever is greater.

The above paragraph shall not apply if Will Bucher voluntarily resigns or is terminated for any of the following cause: disbarment or other loss or suspension of legal license; acts of violence or threatened violence; sexual harassment; stealing Firm money or property; falsifying records; conviction of a felony or other

crime which suggests a lack of truthfulness; using illegal drugs or watching pornography in the office; consuming alcohol in the office while working on client matters.

This agreement shall be effective as soon as (1) Jeffrey Zaiger and Will Bucher have signed this agreement; and (2) Z LLC and Will Bucher enter into a funding agreement regarding the Strategies with Black Diamond.

This agreement shall terminate upon the earlier of (1) the formation of the partnership currently contemplated by Jeff Zaiger and Will Bucher on terms similar or identical to those laid out in this agreement, or (2) four years.

By: _____
Will Bucher

Date: 10/28/2022

By: _____
Jeffrey Zaiger, on behalf on himself and
Zaiger LLC
Date: 10/28/22